**UNITED STATES of America**

v.

**LBS BANK—NEW YORK, INC.**

**Crim. A. No. 88–00516–05.**

United States District Court, E.D. Pennsylvania.

July 25, 1990.

---

**498**

Thomas J. Reuter and Paul A. Sarmousakis, Asst. U.S. Attys., Philadelphia, Pa., for plaintiff.

Vincent Fuller and Kathleen Beggs, Washington, D.C., for defendant.

## OPINION AND ORDER

DuBOIS, District Judge.

After a twelve week trial, defendant LBS Bank—New York, Inc., ("LBS" or "the Bank") was convicted by a jury of one count of conspiracy to defraud the United States[1] under 18 U.S.C. § 371.[2] Presently before the Court are the Bank's Motion for Judgment of Acquittal (sometimes referred to as "Motion for JA") and Motion for New Trial (sometimes referred to as "Motion for NT"). For the reasons stated in the opinion below, the Bank's Motions will be denied.

### I. *Motion for Judgment of Acquittal*

#### A. Due Process Claim

■ Defendant LBS argues that the Court must grant a judgment of acquittal because its conviction "rests substantially entirely [sic] on evidence tainted by unfair and unreliable investigative techniques that violated the Due Process Clause of the

---

**1.** Count One of the Superseding Indictment, paragraph 14, charged that LBS

> did knowingly, willfully and unlawfully conspire, combine, confederate and agree ... to defraud the United States by impeding, impairing, obstructing, and defeating the lawful governmental function of the Department of the Treasury of the United States of America in the collection of accurate data, reports, and information relating to domestic currency transactions and the transportation of currency outside of the United States, under the circumstances, by the means and methods set

forth in paragraphs 15 through 23 of this Count.

**2.** 18 U.S.C. § 371 reads in relevant part as follows:

> If two or persons conspire either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose, and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined not more than $10,000 or imprisoned not more than five years, or both.

Fifth Amendment." (Motion for JA at 2). More specifically, LBS argues that when the government is in control of an undercover operation, due process requires the investigators to attempt to minimize any ambiguities in the evidence which is used to form the basis of the conviction. LBS contends that it was denied due process because the investigating agents never "apprised LBS of the illegality of their activity," (Motion for JA at 15), or "gave the bankers the chance to state flatly that they had never agreed to do anything illegal." (Motion for JA at 7).

Courts have recognized that "[p]erhaps at some point deliberate governmental efforts to render ambiguous events over which agents can exercise considerable control would transgress due process limits of fundamental fairness." *United States v. Myers*, 692 F.2d 823, 843 (2nd Cir.1982), *cert. denied*, 461 U.S. 961, 103 S.Ct. 2438, 77 L.Ed.2d 1322 (1983). However, the instances where government investigative techniques are so outrageous that they violate the Due Process Clause are rare.[3] The Third Circuit and other appellate courts "exercise[ ] extreme caution in finding due process violations in undercover settings," *United States v. Gambino*, 788 F.2d 938, 945 n. 2 (3rd Cir.1986), *cert. denied*, 479 U.S. 825, 107 S.Ct. 98, 93 L.Ed.2d 49 (1986), and " 'exercise scrupulous restraint before ... denounc[ing] law enforcement conduct as constitutionally unacceptable.' " *Id.*, quoting *United States v. Jannotti*, 673 F.2d 578, 607 (3rd Cir.1982) (en banc), *cert. denied*, 457 U.S. 1106, 102 S.Ct. 2906, 73 L.Ed.2d 1315 (1982).

Applying the foregoing authority to the facts of this case, the Court finds that any ambiguities which remained after the agent concluded his investigation of LBS do not reach the "demonstrable level of outrageousness," *Jannotti*, 673 F.2d at 610, necessary to compel a judgment of acquittal.

█ Furthermore, a defendant must demonstrate that a government agent acted deliberately in allowing the evidence concerning its guilt to remain ambiguous in order to succeed in a due process claim, *see Myers*, 692 F.2d at 843, and LBS has failed to make this showing. Nothing in the record supports the conclusion that the agent investigating LBS did anything but his best in conducting his undercover investigation of the Bank. The agent testified at trial that in dealing with the Bank he attempted to phrase his questions carefully and made every effort to be clear. (Trial Trans. 8/4/89 at 147–48). LBS argues to the contrary that the agent's deliberate efforts to keep ambiguous the evidence concerning the Bank's knowledge of, and intent to effectuate, the illegal purpose or purposes of the conspiracy become apparent when one compares the agent's investigative style with that of another agent's in the case. (Motion for JA at 11–16). The fact that one agent's style differs from that of another, however, is hardly proof that ambiguities which remained in the case were intentional.

█ LBS also contends that even if the Due Process Clause is not implicated, the government's unfair investigative methods require that the government bear the unfavorable inferences from the ambiguous evidence which it created, and that a judgment of acquittal is compelled once these inferences are made unavailable. (Motion for JA at 16–18). LBS points to no cases in which a court, because of ambiguities in the evidence, has used its supervisory powers to deprive the government of favorable inferences to be drawn from such evidence. Instead, LBS cites in support of its argument cases involving deliberate government misconduct or grossly negligent con-

---

**3.** LBS notes that in *United States v. West*, 511 F.2d 1083 (3rd Cir.1975), and *United States v. Twigg*, 588 F.2d 373 (3rd Cir 1978), the Third Circuit found the government's conduct reached that level of outrageousness. Those opinions are of little use in defining what qualifies as "outrageous conduct", however, because the Supreme Court's decision in *Hampton v. United States*, 425 U.S. 484, 96 S.Ct. 1646, 48 L.Ed.2d 113 (1976) calls into question the rationale upon which they were based. *See United States v. Jannotti*, 673 F.2d 578, 610 n. 17 (3rd Cir.1982) (en banc), *cert. denied*, 457 U.S. 1106, 102 S.Ct. 2906, 73 L.Ed.2d 1315 (1982) (refusing to overrule *Twigg* but seemingly limiting it to its facts).

duct, neither of which occurred in the case at bar. *See e.g., United States v. Sanchez,* 603 F.2d 381 (2nd Cir.1979) (government must bear unfavorable inferences from photo spreads "deliberately not retained"); *Government of the Virgin Islands v. Testamark,* 570 F.2d 1162, 1166 (3rd Cir.1978) (noting "gross negligence" in destruction of evidence by government might justify new trial or exclusion of government evidence as to that issue if limiting instruction would be ineffective). This Court will not extend this line of cases to situations such as the case at bar where there is no deliberate government misconduct or grossly negligent conduct.

### B. Sufficiency of the Evidence

■ LBS also asserts that a judgment of acquittal is mandated because there is insufficient evidence to sustain its conviction for conspiracy to defraud the United States through the filing of false and fraudulent Currency Transaction Reports ("CTR's")[4] and/or the failure to file Reports of Appar-

---

4. Count One of the Superseding Indictment, paragraph 22 reads:

 It was further part of the conspiracy that defendants COLE, SPANJOL, LBS BANK—NEW YORK, INC. and MIR would and did file and cause the filing of false and fraudulent Currency Transaction Reports with the IRS of the Department of the Treasury.

5. Count One of the Superseding Indictment, paragraph 23 reads:

 It was further part of the conspiracy that defendant LBS BANK—NEW YORK, INC. did not report to the Internal Revenue Service and other required federal agencies the attempted commission and commission of criminal violations of the United States Code involving or affecting the assets or affairs of defendant LBS BANK—NEW YORK, INC., that is, the attempted commission and the commission of currency offenses in violation of 31 U.S.C. § 5311, et seq. [Bank Secrecy Act] and implementing regulations, as required by 12 C.F.R. § 353.1.

6. LBS argues that the presumption that a jury verdict is reasonable should not apply in this case because of the alleged inconsistency between the jury's acquittal of Vinko Mir and its conviction of the Bank. LBS, relying upon *Pevely Dairy Co. v. United States,* 178 F.2d 363 (8th Cir.1949), *cert. denied,* 339 U.S. 942, 70 S.Ct. 794, 94 L.Ed. 1358 (1950), argues that "[t]he acquittal of Mir 'stripped the verdict of guilty as against [the corporate defendant] of all sem-

---

ent Crimes.[5] In ruling upon a post-trial motion for a judgment of acquittal based upon alleged insufficiency of the evidence, the Court

> must view the evidence in the light most favorable to the verdict, and must presume that the jury has properly carried out its functions of evaluating credibility of witnesses, finding the facts, and drawing justifiable inferences. A verdict will be overruled only if no reasonable juror could accept the evidence as sufficient to support the conclusion of the defendant's guilt beyond a reasonable doubt.

*Unites States v. Coleman,* 811 F.2d 804, 807 (3rd Cir.1987), *cert. denied,* 490 U.S. 1070, 109 S.Ct 2074, 104 L.Ed.2d 638 (1989), quoting *United States v. Campbell,* 702 F.2d 262, 264 (D.C.Cir.1983) (citations omitted).[6]

■ The fact that evidence presented at trial is circumstantial, as opposed to direct, does not make it less probative. *United States v. Bycer,* 593 F.2d 549, 551

---

blance of logic or reason, and ... weakened the presumption of correctness usually attributable to the verdict of a jury.' " (Motion for JA at 23–24, quoting *Pevely Dairy Co.,* 178 F.2d at 371).

The case upon which LBS relies for this proposition, however, is inconsistent with subsequent Supreme Court decisions. The Court has stated on two occasions since *Pevely* was decided that an acquittal should not affect a jury finding of guilt on another charge which is dependent on the same factual allegations. The Court reasoned that an acquittal of one defendant does not necessarily indicate that the jury found insufficient evidence to convict that defendant; instead, the acquittal could be a product of juror lenity. *See United States v. Powell,* 469 U.S. 57, 64–5, 105 S.Ct. 471, 476–7, 83 L.Ed.2d 461 (1984) (" 'The most that can be said ... is that the verdict shows that either in the acquittal or the conviction the jury did not speak their real conclusions, but that does not show that they were not convinced of the defendant's guilt' ") (quoting *Dunn v. United States,* 284 U.S. 390, 393, 52 S.Ct. 189, 190, 76 L.Ed. 356 (1932)); *Standefer v. United States,* 447 U.S. 10, 100 S.Ct. 1999, 64 L.Ed.2d 689 (1980). *See also United States v. Velasquez,* 885 F.2d 1076, 1091 n. 13 (3rd Cir.1989), *cert. denied,* — U.S. —, 110 S.Ct. 1321, 108 L.Ed.2d 497 (1990) (discussing meaning of *Standefer* and *Powell*).

In light of the *Powell* and *Standefer* decisions, the Court will not disturb the presumption of correctness given to jury verdicts.

(3rd Cir.1979). The government can rely entirely upon circumstantial evidence to prove the elements of conspiracy. *See e.g., Coleman,* 811 F.2d at 807. A jury can infer from a defendant's acts what he has agreed to do, and, therefore, a criminal conspiracy can be inferred from the performance of acts that further its purpose. *See Hamling v. United States,* 418 U.S. 87, 124, 94 S.Ct. 2887, 2911, 41 L.Ed.2d 590 (1974). *See also United States v. Georga,* 210 F.2d 45, 48 (3rd Cir.1954) ("The common plan can be and must often be established by what people do rather than by what they say").

■ In its Motion, LBS argues that it is entitled to a judgment of acquittal due to insufficient evidence for two reasons. First, LBS asserts that there is not enough evidence to establish that a single agent [7] of LBS had the specific intent to defraud the government as is required for conviction under 18 U.S.C. § 371. It argues that Vinko Mir, the Bank's Chairman, was the only agent of LBS as to whom the government presented any evidence of specific criminal intent which could have been imputed to the Bank, and that the government cannot rely on this evidence to sustain LBS's conviction because the jury, in acquitting Vinko Mir, found that Mir did not possess the requisite intent. Second, LBS contends that a judgment of acquittal must be granted because there is no evidence establishing with whom LBS allegedly conspired. It argues that no agent of LBS other than Vinko Mir had any appreciable contact with the Bank's alleged co-conspirators and that due to Mir's acquittal, the conviction of the Bank must be overturned because there is no evidence of the identity of any person with whom any other agent of the Bank conspired.

**(1) *Evidence of Specific Intent of Agents of LBS***

**a. Vinko Mir—Specific Intent.**

■ In determining whether the jury verdict is supported by sufficient evidence, the Court must determine whether the verdict can be sustained upon evidence of Vinko Mir's specific intent or whether this evidence necessarily must be disregarded due to Mir's acquittal. LBS asserts that evidence of Mir's intent cannot be used to sustain the verdict against the Bank because the guilt of a corporate defendant cannot be predicated upon the acts of an agent acquitted by the jury of the same charge.

The Bank's position, however, runs contrary to rulings of the vast majority of the Courts of Appeals.[8] More importantly, it is contrary to rulings of the Supreme Court in several recent cases. In those cases, the Supreme Court ruled that acquittal does not necessarily indicate that the jury found insufficient evidence on that count; it sim-

**7.** There is a question as to whether the government can aggregate the states of mind of the Bank's agents in order to meet its burden of proving that LBS had the specific intent to violate the law. Although knowledge possessed by employees is aggregated so that a corporate defendant is considered to have acquired the collective knowledge of its employees, *see e.g., Kern Oil and Refining Co. v. Tenneco Oil Co.,* 792 F.2d 1380, 1386–87 (9th Cir.1986), *cert. denied,* 480 U.S. 906, 107 S.Ct. 1349, 94 L.Ed.2d 520 (1987), *United States v. T.I.M.E.—D.C., Inc.,* 381 F.Supp. 730, 738–41 (W.D.Va.1974), specific intent cannot be aggregated similarly. *See First Equity Corp. v. Standard & Poor's Corp.,* 690 F.Supp. 256, 260 (S.D.N.Y.1988) ("A corporation can be held to have a particular state of mind only when that state of mind is possessed by a single individual"). Thus, in order for the verdict against LBS to stand, there must be evidence from which a jury could reasonably determine that at least one agent of LBS had the specific intent to join the conspiracy to defraud the government.

**8.** *See e.g., United States v. Young Brothers, Inc.,* 728 F.2d 682, 688 (5th Cir.1984), *cert. denied,* 469 U.S. 881, 105 S.Ct. 246, 83 L.Ed.2d 184 (1984); *United States v. American Stevedores, Inc.,* 310 F.2d 47, 48–49 (2nd Cir.1962), *cert. denied,* 371 U.S. 969, 83 S.Ct. 552, 9 L.Ed.2d 539 (1963); *Magnolia Motor & Logging Co. v. United States,* 264 F.2d 950, 953 (9th Cir.1959), *cert. denied,* 361 U.S. 815, 80 S.Ct. 54, 4 L.Ed.2d 61 (1959); *United States v. General Motors,* 121 F.2d 376, 411 (7th Cir.1941), *cert. denied,* 314 U.S. 618, 62 S.Ct. 105, 86 L.Ed. 497 (1941) ("In other words, we believe that the acquittal of the officers and agents, even if they had been the only persons through whom the corporations could have acted, should not operate without more to set aside the verdict against the corporations").

ply could be a product of juror lenity. The Court has instructed, therefore, that an acquittal should not mandate a reversal of a finding of guilt on another count which is dependant on the same factual findings. *See United States v. Powell,* 469 U.S. 57, 62–67, 105 S.Ct. 471, 475–78, 83 L.Ed.2d 461 (1984); *Standefer v. United States,* 447 U.S. 10, 22–24, 100 S.Ct. 1999, 2007–08, 64 L.Ed.2d 689 (1980).[9] Under this rationale, there is no reason why a court, in attempting to determine whether a conviction of a corporate defendant is supported by sufficient evidence, should not look to all of the evidence presented at trial, including that which concerns the acts of corporate agents who were acquitted by the jury. For this reason, the Court concludes that evidence of Vinko Mir's conduct can be used to sustain a verdict against LBS despite the fact that Mir was himself acquitted.

**9.** *See also supra* note 6 (discussing same).

**10.** Cafo Boga, a Vice–President of LBS, testified Mir was present during an LBS Board of Directors meeting held on June 30, 1987, at which the Board discussed and adopted its Bank Secrecy Act Compliance Program. (Trial Trans. 8/8/89 at 164–8). The program provided that the Bank "verify and record the name and address of the individual presenting a transaction." (Gov.Ex. 120 at 4). In addition, the government introduced evidence that the LBS Code of Conduct, in effect since 1987, was distributed to all employees and officers. The Code required that "[b]efore effecting any currency transaction for which a report is required, the bank shall verify and record the name and address of the individual presenting the transaction, as well as record the identity, account number, and the social security or taxpayer identification number, if any, of any person or entity for whose account the transaction is to be effected." (Gov.Ex. 135 at 6) (Trial Trans. 8/8/89 at 178–181).

**11.** Mir's knowledge that the CTR's were completed incorrectly can be inferred from statements made during his May 11, 1988, meeting with Special Agent DelSanto at LBS. (Tape 155 at 6, 7, 17, 24, 25, 35, 37–39, 40–42).

**12.** For example, Cole testified that he met with Mir in Yugoslavia in January 1988, and explained to him that he was attempting to avoid and evade U.S. income tax. (Trial Trans. 6/26/89 at 64–71). Cole stated at trial that on March 23, 1988, he met with Mir at LBS Bank in New York to open a checking account and

After reviewing the evidence presented at trial relating to Mir's activities, the Court concludes that there is sufficient evidence relating to Mir upon which the jury reasonably could have convicted LBS. From the evidence introduced at trial the jury reasonably could have found that Mir was aware of the reporting requirements of the Bank Secrecy Act ("the Act") and the correct way to complete CTR's.[10] There was also sufficient evidence presented from which a jury could reasonably conclude that Mir knew the Bank had filed false CTR's in that Special Agent DelSanto's name did not appear on the forms.[11] The government also presented sufficient evidence from which a jury could conclude that Mir knew Hubert Cole and Vjekoslav Spanjol were attempting to defraud the United States through the filing of false CTR forms and that Mir intended to help effectuate at least one of their objectives.[12]

signed the application "Milos Vrenc." When Goran Gazivoda, the Bank's President, began to question Cole about his business, Mir cut Gazivoda off and said acquiring this information would not be necessary because no loans were being made and that the transaction involved "private banking." (Trial Trans. 6/28/89 at 122–126). Cole testified that at this meeting he told Mir he was evading United States taxes on money skimmed from different corporations in the United States and wanted no reports filed with the U.S. Government regarding the currency transaction. (Trial Trans. 6/28/89 at 125).

Special Agent DelSanto testified Cole met with him on March 23, 1988, in Philadelphia and told him that the Chairman of the Board at LBS had agreed to help him exchange cash for a cashier's check. (Trial Trans. 8/2/89 at 205–208). The next day, before returning to LBS, Cole told DelSanto that he believed no reports would be filed by LBS but if they were, he believed they would be filed in the name of a Yugoslavian company, Lehman Kuhn, Associates, Ltd., ("Lehman Kuhn"), or its president, Milos Vrenc. (Trial Trans. 8/2/89 at 213–214); (Tape 128 at 50–51).

DelSanto testified at trial that on April 1, 1988, Cole and Spanjol met with Mir at LBS, and they discussed the problems associated with not filing CTR's and the structuring of bank accounts. (Trial Trans. 8/3/89 at 40–43) (Tape 133 at 14, 22, 30, 31, 37, 38). Cole testified that he told Mir the CTR's would be prepared in the name of Lehman Kuhn's Yugoslavian president, Milos Vrenc, so that Cole's clients would not be exposed. He also testified that Mir, contrary to the Bank's Compliance Program, agreed that

LBS contends that even if the Court decides to consider the acts of Vinko Mir in ruling upon the sufficiency of the evidence, there is insufficient evidence to support LBS's conviction based upon Mir's acts. First, LBS asserts that the testimony of one of the government's principal witnesses against Mir, Hubert Cole, is unreliable because it is contradicted by "Mir's much more logical testimony," (Motion for JA at 34). LBS also contends that any damaging remarks made by Mir on tape are either subject to an innocent interpretation or are the result of Mir's difficulty with the English language.

 This Court, however, is not at liberty to grant a judgment of acquittal simply because the Court might have judged the credibility of a witness differently or because the evidence upon which the jury might have relied in reaching its guilty verdict is subject to a differing interpretation. The jury verdict cannot be overturned unless the Court finds that no reasonable juror could convict based upon the evidence presented. The Court does not find this to be the case.

### b. Other Agents of LBS—Specific Intent.

Even if the evidence as to Mir's activities is disregarded, the Court finds that there is sufficient evidence to convict the Bank of conspiracy to defraud the United States based upon the actions of its other employees: Vlado Sodin, President; Goran Gazivoda, Vice–President; and Danny Leung, Supervisor of Accounting.

Vlado Sodin testified at trial that he was aware of the Bank Secrecy Act and the Bank's Compliance Program. (Trial Trans. 8/14/89 at 60–62). There was also evidence from which the jury could infer that Sodin knew of Cole's plan to defraud the government,[13] agreed to assist him in this plan, and intended to effectuate at least one objective of that conspiracy.[14]

Cole should take the CTR's home to fill out himself. (Trial Trans. 7/5/89 at 24–30).

DelSanto testified at trial that later on April 11, 1988, he brought $81,695 in cash in a suitcase to the Bank and let it be known to Mir that the cash belonged to him and not a Yugoslavian business. (Trial Trans. 8/3/89 at 36–41). DelSanto deposited that money in an account opened in the name of Lehman Kuhn. (Trial Trans. 8/3/89 at 43–44, 56–57) (Tape 133, at 16, 18, 23). Mir acknowledged that he understood the cash belonged to DelSanto. (Trial Trans. 8/23/89 at 162). DelSanto recounted at trial that he told Mir he did not want any forms put in his name. (Trial Trans. 8/3/89 at 39–40) (Tape 133 at 17). In return for the cash he deposited, DelSanto withdrew $76,350 from the account in the form of a cashier's check. (Trial Trans. 8/3/89 at 43, 56–57).

Cole also testified about a private meeting he had with Mir on April 28, 1989. At this meeting Mir told him they must file reports; Cole replied that he wanted no more reports filed because that would lead to an investigation. (Trial Trans. 7/7/89 at 57–59); (Trial Trans. 7/10/89 at 27). Cole testified that Mir stated LBS would continue to assist Cole as long as it did not get caught and could pass an audit. (Trial Trans. 7/10/89 at 40). Cole also stated at trial he believed Mir understood tax evasion was part of his plan, (Trial Trans. 7/19/89 at 175–177), and he believed Mir would not turn in to the authorities anybody involved in the transactions. (Trial Trans. 7/10/89 at 28–29).

DelSanto testified he had a telephone conversation with Mir on May 10, 1988, during which Mir stated there could be no more reports like those that were completed for the prior transactions. In that conversation, according to DelSanto, Mir suggested DelSanto continue to carry money into Yugoslavia in suitcases to get around the reporting problem. (Trial Trans. 8/3/89 at 72).

The government presented evidence from which a jury could conclude that on May 11, 1988, Mir knew the two previously filed CTR's contained false information. Mir told DelSanto that bank regulators probably would not question him about the CTR's and that they would instead question low-level employees who would know nothing about the transactions. (Tape 155 at 37–42). Mir's parting words to DelSanto at the end of this meeting were, "Maybe we invent something. I don't know what." (Tape 155 at 46).

**13.** Sodin admitted he had learned from Vinko Mir that Cole's banking transactions were unusual in the respect that large sums of cash were deposited in the Bank and immediately taken out. (Trial Trans. 8/14/89 at 82–85). In addition, a jury could reasonably conclude from the evidence collected during DelSanto's May 10, 1988, meeting with Sodin at LBS that Sodin had learned about the illegal nature of the conspiracy from Mir and that the CTR's previously filed by LBS were incorrect. (Tape 154 at 6, 8, 10, 12–19, 21, 23–24, 25, 27).

**14.** Sodin stated at trial that LBS was mainly a commercial bank in that it did not have a retail

Similar evidence was introduced as to Goran Gazivoda. There was testimony from which a jury could conclude that Goran Gazivoda knew how to complete correctly CTR forms,[15] knew that the CTR's filed by LBS were completed incorrectly, intended to enter into a conspiracy to defraud the United States, and intended to achieve at least one of the objectives of that conspiracy by approving false CTR's and failing to file Reports of Apparent Crimes.[16]

The conviction of LBS can also be sustained on the evidence relating to the acts of Danny Leung. Leung testified at trial that he was aware of the CTR requirements. (Trial Trans. 8/14/89 at 113). There is evidence from which the jury could infer that Leung knew how to complete accurately the CTRs.[17] Leung testi-

business. He admitted the transactions completed by Cole were unusual in that large amounts of cash were deposited and immediately withdrawn. (Trial Trans. 8/14/89 at 82–85).

On May 10, 1988, Sodin met with DelSanto at LBS. A jury could reasonably conclude from the evidence concerning this meeting that Sodin had learned from Mir about the illegal nature of the conspiracy and that the CTR's previously filed by LBS were incorrect. (Tape 154 at 6, 8, 10, 12–19, 21, 23–24, 25, 27). For example, the jury could have concluded that when Sodin said to Mir, "you told them [DelSanto and Cole] on this that we can't work on the same basis as the last time, didn't you?" (Tape 154 at 10), Sodin was referring to the filing of the false CTR's.

Sodin acknowledged at trial that as the President of LBS, he was interested in obtaining the ten's of millions of dollars in business for the Bank that was discussed by Cole at a March 1988 meeting at LBS. (Trial Trans. 8/14/89 at 69–70).

There is also evidence from which the jury could conclude that Sodin agreed to assist DelSanto if DelSanto left large sums of money in the Bank, (Tape 154 at 6, 8, 10, 12–19, 21, 23–24, 25, 27); for example, there is evidence Sodin told DelSanto that LBS could "find some arrangement" with DelSanto if he left large amounts of currency in the Bank for an extended period of time so that the Bank would have a "float." (Tape 154 at 23–24).

**15.** Cafo Boga testified at trial that LBS's Code of Conduct was distributed to all employees and officers. It provided: "Before effecting any currency transaction for which a report is required, the bank shall verify and record the name and address of the individual presenting the transaction, as well as record the identity, account number, and the social security or taxpayer identification number, if any, of any person or entity for whose account the transaction is to be effected." (Gov. Ex. 135 at 6) (Trial Trans. 8/8/89 at 178–181). Prior to April 1, 1988, LBS had possession of two Bank Secrecy Act compliance books written by Robert Powis, (Gov. Ex. 91–92), as well as information about the Act supplied to LBS by the FDIC. (Gov.Ex. 70A, 71, 136C, 137).

**16.** Cole testified Gazivoda was present at the March 23, 1988, meeting at LBS when Cole filled out the forms to open a checking account. Gazivoda attempted to question Cole about his business, but was cut off when Mir said this involved "private banking." (Trial Trans. 6/28/89 at 123–126).

Gazivoda was present at the Bank on March 24, 1988, when DelSanto deposited $53,500 in cash. Gazivoda gave DelSanto a bank check in the amount of $50,000 made payable to Empire Investment Consultants. In return, DelSanto gave the cash to bank officials to be deposited. (Trial Trans. 8/3/89 at 10–16). There is evidence from which a jury could conclude that Cole told Gazivoda the funds belonged to DelSanto. (Tape 129 at 19). DelSanto testified that when Leung mentioned the CTR forms, Gazivoda looked like he had been "stung by a bee." (Trial Trans. 8/3/89 at 15). Gazivoda stated at that time that the Bank would prepare the CTR's in accordance with the Bank's Compliance Program. (Tape 129 at 82–84). At no time did Gazivoda attempt to verify the identities of Cole or DelSanto or the information placed on the CTR form.

There was evidence that at the April 1, 1988, meeting at LBS, Cole told Gazivoda he did not want the CTR's to reflect either his name or DelSanto's; Cole stated, "[t]he individual for whom we are depositing it, should be on it, not the courier." In response Gazivoda stated, "Ok, ok." (Tape 133 at 71). Furthermore, Cole testified Gazivoda gave the CTR form and instruction book to him and discussed an agreement by which Cole would fill out the CTR's himself. (Trial Trans. 7/5/89 at 30) (Tape 133 at 55–57, 69–71, 90–92). Gazivoda allowed this despite the fact that on March 24, 1988, he told Cole the Bank would have to prepare the forms. After the indictment was returned, however, Gazivoda told the FDIC Examiner, Walter Ritter, he did not know how the depositors had received the CTR's and the instruction book. (Trial Trans. 8/7/89 at 88–89, 90–92). This statement directly contradicts Gazivoda's tape-recorded statements of April 1, 1988. (Tape 133 at 55–57, 68–71, 90–92).

**17.** It was Leung's responsibility to complete the CTR's for the transactions at issue. (Trial Trans. 8/14/89 at 111–113). A variety of materials were available to Leung concerning the Bank Secrecy Act, including instruction manuals on the Act. (Gov. Ex. 91, 92). Leung admitted at trial to using these manuals in completing the portions of the forms that Cole had not filled out. (Trial Trans. 8/14/89 at 133–34).

fied that he knew the forms had been completed by Cole, not the Bank, and there was evidence from which the jury could conclude that Leung knew they had been prepared in a manner which violated the Bank Secrecy Act.[18] There was also evidence presented at trial from which the jury could infer that Leung had agreed to help Cole defraud the government by assisting in filing false CTR's and failing to file Reports of Apparent Crimes.[19]

LBS argues that this evidence concerning Vlado Sodin, Goran Gazivoda, and Danny Leung is insufficient to support a verdict against the Bank. The Bank contends that there is no " 'logical and convincing connection,' " (Motion for JA at 25, quoting, *Bycer*, 593 F.2d at 550–551), between the facts proven and any inference of guilt because the actions and statements of Sodin, Gazivoda, and Leung are subject to innocent interpretation.

As stated earlier in this opinion, it is the job of the jury, not the Court, to interpret the evidence and evaluate the credibility of witnesses at trial. The Court is not at liberty to disturb the verdict of the jury unless it has no basis in reason. This is not a case, as LBS contends, where a judgment of acquittal is mandated because the government obtained conviction by impermissibly 'piling inference upon inference.' *United States v. Coleman*, 811 F.2d at 808, quoting *Anderson v. United States*, 417 U.S. 211, 224, 94 S.Ct. 2253, 2262, 41 L.Ed.2d 20 (1974). The evidence presented against LBS, for example, is much stronger than that presented against the defendants in *Bycer* or *Coleman*, cases to which LBS has called the Court's attention. In *Cole-*

*man,* the conviction of the defendant for conspiracy and obstruction of justice was overturned because the only evidence upon which it was based was that the dead body of a witness in the upcoming criminal trial of one of the defendant's friends was found in the defendant's motel room. *Coleman,* 811 F.2d at 808. In *Bycer,* the conviction of a pharmacist for distributing drugs was overturned because there was no evidence of guilt other than missing inventory, inventory to which at least six other people had access. *Bycer,* 593 F.2d at 552.

In addition, LBS argues that the government cannot rely upon false exculpatory statements made by Gazivoda or Leung to sustain the verdict against the Bank. LBS does not deny that "false exculpatory statements made to law enforcement officials are circumstantial evidence of consciousness of guilt and have independent probative force ..." *United States v. Johnson,* 513 F.2d 819, 824 (2nd Cir.1975). Instead, LBS contends that " 'falsehoods told by a defendant in the hope of extricating himself from suspicious circumstance are insufficient proof upon which to convict where other evidence of guilt is weak and the evidence before the court is as hospitable to an interpretation consistent with the defendant's innocence as it is to the Government's theory of guilt.' " (Motion for JA at 25–26) (quoting *Johnson,* 513 F.2d at 824). However, in *Johnson,* the case upon which LBS relies, the conviction of a defendant for conspiracy and importation of methamphetamine was overturned because the only evidence against the defendant, aside from his false exculpatory statement, was his friendship with a drug

---

**18.** Notwithstanding the fact that it was Leung's responsibility to complete the CTR's, Leung admitted Gazivoda had instructed him that for the transactions at issue in this case, the customer would fill out the forms. (Trial Trans. 8/14/89 at 127). Leung also admitted he did not verify all of the information on the completed CTR's even though this was a requirement of the Bank Secrecy Act. (Trial Trans. 8/14/89 at 131).

**19.** By signing the CTR's, Leung certified that he had prepared the forms in their entirety. According to IRS Special Agent Jones, Leung also stated to him during questioning that he had filled out the CTR's in their entirety. Leung

made these representations when, in fact, the forms had been completed by Cole. Leung later contradicted himself on this point when questioned by FDIC Examiner Walter Ritter. (Trial Trans. 8/7/89 at 88–89). In addition, Leung's testimony of his discussion with Agent Jones is in direct conflict with that of Agent Jones. (Trial Trans. 8/14/89 at 136).

Leung admitted at trial that he made no effort to verify the information on the CTR's despite the fact that he was required to do so. (Trial Trans. 8/14/89 at 131, 145–155). Leung never filed a Report of Apparent Crimes regarding these transactions.

dealer and his presence in the dealer's car at the time drugs were found. The evidence against Gazivoda and Leung is much stronger than that against the defendant in *Johnson.* This is not a case where the evidence of guilt is weak, or where the evidence presented as to Gazivoda or Leung is equally consistent with innocence.[20]

### (2) *Evidence Concerning Persons With Whom Agents of LBS Conspired*

 In support of its contention that there is insufficient evidence to support its conviction, LBS argues there is no evidence which establishes with whom the Bank conspired. Starting with the proposition that the only parties with whom it could have conspired are Hubert Cole or Vjekoslav Spanjol, LBS argues that the acquittal of Vinko Mir eliminates the possibility of a conspiracy between Mir and Cole or Spanjol. LBS further contends it is implausible that a conspiracy existed between any other Bank employees and Cole and/or Spanjol.[21]

As explained above, LBS is incorrect when it asserts that its conviction cannot be predicated on the acts of Vinko Mir due to his acquittal.[22] Therefore, the jury reasonably could have found that LBS conspired through Mir with Cole and/or Spanjol.[23]

LBS is also mistaken when it argues there is insufficient evidence to establish a conspiracy between the other employees of the Bank—Sodin, Gazivoda, and Leung— and Cole and/or Spanjol. Contrary to what LBS contends, the fact that Sodin, Gazivoda, and Leung might not have had any significant contact with the alleged co-conspirators, (LBS Reply to Gov.Opp. to Motion for JA at 8), is not dispositive. It is not necessary that the government prove the existence of a formal agreement; agreement to join a conspiracy "may be inferred from interrelated facts and cir-

cumstances which lead reasonably and logically to the conclusion that the activities of the participants would not have occurred as they did absent a preconceived scheme or common understanding." *United States v. Torres,* 862 F.2d 1025, 1027 (3rd Cir.1988). A person's participation in a conspiracy may be shown by "proof of concert of action in the commission of an unlawful act from which a plan, common design or an agreement can be inferred." *United States v. Zuideveld,* 316 F.2d 873, 878 (7th Cir.1963), *cert. denied,* 376 U.S. 916, 84 S.Ct. 671, 11 L.Ed.2d 612 (1964).

As chronicled above, there is sufficient evidence from which the jury could have concluded that Sodin, Gazivoda, and Leung conspired with Cole and/or Spanjol to defraud the government by filing false CTR's and failing to file Reports of Apparent Crime.

### II. *Motion for a New Trial*

In the alternative, if the Court denies its Motion for a Judgment of Acquittal, LBS asks the Court for a new trial. LBS contends that it is entitled to a new trial for three reasons. First, the Bank argues that it was denied due process of law when the Court denied its May 16, 1989, Motion for a Bill of Particulars. Second, the Bank contends that the Court unfairly undermined its defense of lack of specific intent by instructing the jury that it could not consider the Power of Attorney executed by Milos Vrenc in determining whether Part I of the CTR forms filed by LBS was completed accurately. Third, LBS asserts that the Court unfairly prejudiced it by allowing the jury to consider its failure to file amended CTRs, when it had no duty to file amended forms, in determining whether the Bank knew that the forms were false and intended to conceal the filing of the false CTRs.

---

**20.** *See supra* notes 15–19 and accompanying text.

**21.** The Bank also suggests that it could have conspired with its own employees, but then argues there is insufficient evidence to sustain its

conviction on this basis. Since the government does not appear to contest that position, the Court will not address the question.

**22.** See *supra* note 6 & pp. 501–503.

**23.** *See supra* pp. 501–503.

### A. Bill of Particulars

LBS contends that the denial of its May 16, 1989, request for a Bill of Particulars deprived it of due process of law because it left the Bank without notice of the charges against it. Specifically, LBS argues that "[t]he Superseding Indictment did not indicate which of the many criminal acts allegedly committed by various defendants and charged in the Indictment should have been so reported—or indeed whether it was an uncharged criminal act which should have been reported." (Motion for NT at 9).[24]

■ When considering a Motion for a Bill of Particulars pursuant to Federal Rule of Criminal Procedure 7(f), a court should consider the purposes behind bills of particulars. These are: (1) to inform the defendant of the nature of the charges against him so he may adequately prepare his defense, (2) to avoid surprise during trial, and (3) to protect the defendant against a second prosecution for an inadequately described offense. *United States v. Addonizio*, 451 F.2d 49, 63–64 (3rd Cir. 1971), *cert. denied*, 405 U.S. 936, 92 S.Ct. 949, 30 L.Ed.2d 812 (1972). In ruling upon whether a bill of particulars should be granted, trial courts are given wide latitude. *See Will v. United States*, 389 U.S. 90, 98–99, 88 S.Ct. 269, 275, 19 L.Ed.2d 305 (1967) ("[F]ederal trial courts have always had very broad discretion in ruling upon requests for such bills").

Bills of particulars are not to be used as a discovery tool by the defendant. *See United States v. Nacrelli*, 468 F.Supp. 241, 250 (E.D.Pa.1979), *aff'd mem.* 614 F.2d 771 (3rd Cir.1980). As one court explained,

> The purpose of a bill of particulars is ... not to compel the disclosure of how much the government can prove and how much it cannot nor to foreclose the government from using proof it may develop as the trial approaches. Discovery in criminal proceedings is not comparable to discovery in civil because of the nature of

the issues, the danger of intimidation of witnesses, and the greater danger of perjury and subornation of perjury.

*United States v. Malinsky*, 19 F.R.D. 426, 428 (S.D.N.Y.1956).

■ After examining the record, the Court concludes that the denial of LBS's May 16, 1989, Motion for a Bill of Particulars was not in error. LBS's request for an enumeration of the crimes which the Bank failed to report was aimed at the government's proof at trial rather than at clarifying the indictment; it requested "evidentiary detail" as opposed to basic information necessary to inform the defendant of the "specific nature" of its alleged criminal conduct. *See United States v. Deerfield*, 501 F.Supp. 796, 809–811 (E.D.Pa.1980). LBS was charged with conspiracy to defraud the United States in Count One of the Superseding Indictment, and the Bank's failure to file a Report of Apparent Crimes was one of the means or methods by which it allegedly perpetrated the conspiracy. The allegations of Count One of the Superseding Indictment clearly describe the type of report LBS failed to file, the agency with which the report should have been filed, and the federal offenses that should have been reported, i.e., violations of the Bank Secrecy Act, 31 U.S.C. § 5311, *et seq.*[25] In addition, the government provided voluminous discovery in this case, giving LBS access to 230 tape recordings and transcripts compiled during its investigation. *See United States v. Feliziani*, 472 F.Supp. 1037 (D.C.Pa.1979), *aff'd mem.* 622 F.2d 580 (3rd Cir.1980) (finding bill of particulars not necessary and noting government had produced all discovery provided by rules and provided all tapes prior to trial).

Furthermore, the Bank has not demonstrated that it was actually surprised at trial and that its substantial rights were thereby prejudiced. *See e.g., United States v. Wells*, 387 F.2d 807 (7th Cir.1967),

---

**24.** The Superseding Indictment, handed down on April 1, 1989, alleges that LBS "did not report ... the attempted commission and commission of criminal violations ... in violation of 31 U.S.C. § 5311, et seq. [the Bank Secrecy

Act] and implementing regulations, as required by 12 C.F.R. § 353.1." Superseding Indictment ¶ 23.

**25.** *See* Superseding Indictment, Count One.

*cert. denied,* 390 U.S. 1017, 88 S.Ct. 1272, 20 L.Ed.2d 168 (1968) (no reversible error committed in conspiracy case by denying bill of particulars absent actual showing of prejudice). The only specific allegation of prejudice is that during trial LBS "was forced to remain silent so as not to raise before the jury potential 'apparent crimes' the government did not contemplate, such as the purported offer of a 'bribe' to Mr. Mir." (Motion for NT at 13). This however is not sufficient to warrant the granting of a new trial. As courts have recognized,

> Of course every denial of a defendant's request for a bill of particulars may in some measure make the preparation of the defense more onerous. But a demonstration of this generalized kind of prejudice is insufficient to override the broad discretionary power vested in the district court with respect to such prejudice.

*Wells,* 387 F.2d at 808.

LBS's contentions seem even more incredible in view of the fact that it never renewed its request for a bill of particulars concerning the failure to file a Report of Apparent Crimes. LBS filed its first Motion for a Bill of Particulars on May 16, 1989, and the Court denied it on June 7, 1989, as it related to the Report of Apparent Crimes. During a hearing on the record on June 12, 1989, the Court, in denying another of the Bank's motions, stated to counsel, "You can renew any motion that you have made and I have denied ... and then I will rule on the motion when you renew it. I don't want to encourage you ... to renew a motion that I have just denied; but if you are asking whether you may bring up the subject again the answer is yes." (Hearing Trans. 6/12/89 at 43). Despite this colloquy, the Bank *never* renewed its Motion for a Bill of Particulars concerning the Report of Apparent Crimes, although it did renew its Motion for a Bill of Particulars as to the identities of unindicted co-conspirators, which the Court granted. (Trial Trans. 7/20/89 at 3–4); (Trial Trans. 7/24/89 at 10–11); (Trial Trans. 7/26/89 at 206–09).

Furthermore, at various points during the trial the Bank objected to the introduction of evidence concerning its failure to file Reports of Apparent Crimes, and none of those objections concerned the Bank's inability to discern which crimes it should have reported.[26] The Bank even suggested several amendments to the Court's charge on the failure to file Reports of Apparent Crimes without mentioning this problem. (Trial Trans. 8/31/89 at 39–41).[27] If the Bank were incapable of preparing an adequate defense due to the denial of its Motion for a Bill of Particulars concerning which crimes the Bank failed to report, it would have been logical for the Bank to renew its Motion at some point during the trial or to object to the Court's charge concerning the failure to file Reports of Apparent Crimes on this basis, which it failed to do.

### B. Power of Attorney

▬ LBS alleges that it is entitled to a new trial because of the Court's instruction to the jury concerning the Power of Attorney executed by Milos Vrenc.[28] In order to

---

**26.** LBS argued at several points that the it would be unconstitutional under the Fourth Amendment to use the Bank's failure to file Reports of Apparent Crimes as evidence of participation in the charged conspiracy. (Trial Trans. 8/21/89 at 182) (Trial Trans. 8/23/89 at 95–99). The Bank also argued that it was unconstitutional to predicate the Bank's guilt on its failure to file these reports because the instructions and regulations regarding the need to file Reports of Apparent Crimes were so vague that it would violate the Due Process Clause. (Trial Trans. at 8/11/89 at 27–30) (Trial Trans. at 8/21/89 at 182) (Trial Trans. at 221–224).

**27.** It is true that on August 29, 1989, a request was made that LBS "at least be given notice of what specific offense or crime or activity would still have been reported." The Court then engaged in a brief discussion with counsel for LBS as to what apparent crimes the government was alleging should have been reported. At the end of this discussion, there was no indication that the issue remained unclear, no objection to the charge was made on this ground, and the Motion for a Bill of Particulars was not renewed. (Trial Trans. at 8/29/89 at 95–97).

**28.** The text of the Power of Attorney reads in relevant part as follows:

> I the undersigned (hereinafter called "Principal(s)") MILOS VRENC, as president and director of the designated company hereby

convict the Bank of conspiracy to defraud the government through the filing of false CTR's, the jury had to find that the forms were completed incorrectly and that the Bank specifically intended to file false CTR's. LBS argued to the Court during trial that the Power of Attorney executed by Milos Vrenc should be considered when determining whether Part I of the CTR's in question were completed accurately.[29] LBS contended that because the Power of Attorney gives one person the right to act in the name of another, Hubert Cole did not err when he stated in Part I of the form that Milos Vrenc, not he, was the person who conducted the transaction.

The Court rejected this argument at trial, reasoning that it would emasculate the purpose and requirements of the Bank Secrecy Act to allow state law relating to powers of attorney to affect what information must be reported on CTR forms. (Trial Trans. 8/29/89 at 77–79); (Trial Trans. 8/31/89 at

28–30). The Court also ruled, however, that the Power of Attorney should be considered by the jury in determining whether Part II of the CTR form was completed accurately.[30] The Court further ruled that the Power of Attorney could be used by the Bank in arguing that it did not have the specific intent to violate the law as is required for conviction; thus, LBS was free to argue that any mistakes which appeared on the CTR's were made because of good faith reliance upon the Power of Attorney executed by Milos Vrenc and presented by Hubert Cole. The Court instructed the jury accordingly.[31]

LBS claims that this instruction was an abuse of discretion because it "unfairly prejudiced LBS by destroying its first line of defense—that the CTRs were not false." (Motion for NT at 16). LBS argues that the Court "should ... have permitted the jury, as the finder of fact, to decide for itself—based on *all* the evidence—whether

grant power of attorney to Name 1) Hubert F. Cole 2) Vjeko [sic] Spanjol hereinafter called the "Attorney(s) in fact" to legally represent me in of [sic] my relations in the United States.

The Attorney(s) in fact is/are specifically authorized, without however being bound, to dispose of all assets deposited with or placed in the custody of the designated companies in the name of the Principal(s), to incur debts, to pledge, transfer, withdraw, sell, purchase and replace any assets in the name of the Principal(s).

The Principal(s) is/are fully bound by the Attorneys in fact's signature(s) as well as by any of the latter(s) actions or declarations. It is hereby specifically agreed that the present Power of Attorney shall not be terminated by the death of any one Principal or by the death of several Principals, but will continue to remain in force for both the Attorney(s) in fact and the designated companies. This Power of Attorney is governed exclusively by United States. . . .

The Attorneys shall act and sign individually [sic].

This present Power of Attorney is granted with power of substitution [sic].

**29.** Part I requested the identity of the "individual who conducted the transaction." Hubert Cole filled in the name "Milos Vrenc," as opposed to his own name, in Part I of the CTR form.

**30.** Part II of the form requested the identity of the person or organization "for whom" the

transaction was completed. The CTR completed by Hubert Cole identified "Lehman Kuhn" in Part II.

**31.** The Court charged the jury as follows:

You have heard testimony in this trial about a Power of Attorney secured by Milos Vrenc, a Yugoslavian citizen residing in Opatija, Yugoslavia. The Power of Attorney named Hubert Cole and V.J. Spanjol as attorneys-in-fact. Part I of the CTR form requires the bank to identify the individual or individuals who conducted the transaction. Although the Power of Attorney gave Hubert Cole and V.J. Spanjol authority to act on behalf of Milos Vrenc in such things as opening the account at LBS Bank and withdrawing funds from LBS Bank, I charge you as a matter of law that the Power of Attorney should not be considered by you in determining whether Part I of the CTR form was properly filled out. That part of the form requires the bank *to identify the individual or individuals who* conducted the transaction. You can, however, consider the Power of Attorney, together with all of the other evidence in connection with the filling out of Part II of the CTR form. That part of the CTR form requires an institution to identify the organization or individual for whom or for whose account the transaction was completed. In addition, you can consider the Power of Attorney, together with all of the other evidence, on the issue of the bank's specific intent in connection with Parts I and II.

(Trial Trans. 9/11/89 at 72–73).

the Bank's possession of the Power of Attorney rendered 'Milos Vrenc' a reasonable response to Part I of the CTR form." (Motion for NT at 15) (emphasis in original).

The Court, however, did allow the jury to consider the Power of Attorney in determining whether the response to Part I was "reasonable," i.e., made without intent to violate the law. The Court merely concluded that the Power of Attorney was irrelevant as to whether Part I was filled out accurately, i.e., in accordance with the instructions and regulations governing the filing of CTR's. The instructions and regulations concerning what information needs to be recorded on CTR forms are clear, and they indicate that the existence of the Power of Attorney has no bearing on whether Part I of the CTR's in question was completed correctly.[32] Part I of the CTR form required that Hubert Cole and Special Agent DelSanto be identified because they were the individuals who physically conducted the transaction at the Bank.

This Court refuses to allow the existence of a Power of Attorney to eliminate the requirement that the Bank identify the individuals who conducted the transactions because to do so would frustrate the purposes of the Bank Secrecy Act. The Act requires the completion of CTR forms in part to create a paper trail so that the IRS can determine if taxes have been paid on large sums of cash moving in interstate commerce. *See United States v. Herron,* 825 F.2d 50, 56 (5th Cir.1987). If this

Court were to rule that the Power of Attorney changes the requirements as to what information must be reported, individuals could easily disguise their financial transactions by presenting financial institutions with powers of attorney executed by others. So ruling would also be in direct conflict with the regulations and instructions concerning CTR forms.

In addition to the above argument, LBS contends that prohibiting the jury from considering the Power of Attorney in determining whether Part I of the forms was completed accurately was an abuse of discretion because it "undermined the second point of LBS Bank's defense—that the good faith of the LBS employees who accepted and relied on the Power of Attorney precluded a finding of specific intent to violate the law." (Motion for NT at 16). As explained above, the Court specifically instructed the jury that it could consider the Power of Attorney in determining whether LBS had an intent to violate the law.[33] The Court also allowed LBS to argue to the jury in its closing argument that it relied in good faith upon the Power of Attorney, and LBS did in fact make this argument.

■ LBS complains, however, that the foregoing was insufficient because, by instructing the jury that it could not consider the Power of Attorney in determining whether Part I of the form was completed accurately, the Court conveyed the impres-

**32.** The Bank Secrecy Act regulations provide that CTR's "shall be filed on forms prescribed by the Secretary. All information called for in such forms shall be furnished." 31 C.F.R. § 103.26(d). Part I of the applicable CTR requests the identity of the individual who conducted the transaction. If the individual conducts the transaction for another person, the form instructs the bank to "be sure to complete Part II also." (Gov.Ex. 88A).

The form's instructions relating to the method used by the bank to verify the identity of the person conducting the transaction make it clear that Part I seeks the identity of the person physically conducting the transaction. The relevant instructions to Part I read as follows:

*Item 12—Method used to verify identity.*—All individuals (except employees of armored car services) conducting a currency transaction for themselves *or for another* must be posi-

tively identified.... For U.S. citizens, ask to see and inspect a driver's permit or any other written identification document acceptable to the financial institution in normal check cashing operations....

Furthermore, the regulations require the financial institution to verify the identity of the individual who presented the transaction, regardless of whether he acted alone or on behalf of another. *See* 31 C.F.R. § 103.27; *cf. United States v. American Investors of Pittsburgh, Inc.,* 879 F.2d 1087, 1091 (3rd Cir.1989), *cert. denied,* —— U.S. ——, 110 S.Ct. 368, 107 L.Ed.2d 354 (1989) ("The form provided for reporting currency transactions, Treasury Form 4789, requests the identity of the individual providing the funds and, if that individual is not the owner of the funds, the owner of the funds.")

**33.** *See supra* note 31.

sion that it did not believe the Power of Attorney was a valid legal document on which the Bank should have relied, and the jury as a result disregarded the Power of Attorney altogether. (Motion for NT at 18). This argument is based upon sheer conjecture. As stated previously, there is a presumption that a verdict is reasonable and that it was arrived at in accordance with the court's instructions. LBS has presented no evidence that the jury disregarded, or likely disregarded, the Court's instructions on the Power of Attorney.

### C. The Failure of the Bank to File Amended CTRs

██ LBS argues that the Court committed reversible error by allowing the government to present evidence that the Bank failed to file amended CTR's. First, LBS complains that the Court's instruction to the jury that LBS had no duty to file amended CTRs was inadequate because "[t]he misimpression created when the government introduced evidence that the failure to amend was itself unlawful remained uncorrected throughout 14 weeks of trial," (Motion for NT at 20), and because "[t]he government relied heavily on the absence of amended CTRs ... in both its main closing and rebuttal arguments." (Motion for NT at 20–21).[34]

This argument is without merit. Contrary to the representations of the Bank, the government did not introduce evidence that there was a legal duty to file amended CTR's. The government's expert, IRS Agent Semesky, testified only as to the general instructions on the CTR form re-

garding the filing of amended CTR forms. (Trial Trans. 6/20/89 at 94). In fact, the Agent admitted during cross examination that there is no specific regulation or statute that requires a financial institution to file an amended report. (Trial Trans. 6/20/89 at 111–112). Consequently, there is no reason to believe that the jury disregarded the instruction that the Bank had no duty to amend the CTR forms.

The Bank's second argument on this issue is that it was error for the Court to allow the government to argue that the failure to amend was evidence of the Bank's consciousness of guilt and its attempt to conceal a crime. LBS contends it was unfairly prejudiced because "[w]ithout a legal duty to amend, the absence of amended CTRs is at best ambiguous—equally compatible with guilt or innocence." (Motion for NT at 19).

This argument is also without merit. Trial courts have broad discretion in ruling upon the relevance of evidence. *See e.g., United States v. Hans*, 738 F.2d 88, 91 (3rd Cir.1984). Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed.R.Evid. 401. That LBS failed to file amended CTR's when there was a procedure for doing so, even though there was no legal duty to do so, is relevant to the issues of whether the Bank was conscious of its wrongdoing and whether it intended to achieve the object or objects of the conspiracy.[35] There was evidence from which the jury could conclude that the

---

**34.** The Court charged the jury on the failure to file amended CTR's as follows:

> The law imposes *no* affirmative duty on any institution to amend a filed Currency Transaction Report, even if that institution subsequently discovers that the CTR is inaccurate *or* false as previously filed. The fact that the CTR form provides a box for the indication of whether the form amends a previously filed CTR creates no legal obligation to amend an inaccurate form. Neither the form, the official IRS regulations, or any other federal statute requires financial institutions to amend the CTR at any time.

(Trial Trans. 9/1/89 at 74) (emphasis added to indicate correction of typographical errors in

transcription—"on" was corrected to read "no," and "of" was corrected to read "or").

**35.** *United States v. Prescott*, 581 F.2d 1343 (9th Cir.1978), the case which LBS cites in support of its assertion that the failure to amend is irrelevant, is distinguishable. In *Prescott*, the police requested entry into the defendant's home in an attempt to locate a suspect in a credit card scam. Defendant refused to allow the police to enter her home without a warrant, and this was presented to the jury at defendant's trial as evidence that the defendant was an accessory after the fact. The Ninth Circuit held that admission of this evidence constituted reversible error, not because the evidence was irrelevant, but because defendant's refusal to let police

Bank knew that the forms they had filed were false.[36] That the Bank did not seek to correct the error is therefore probative of whether the Bank attempted to achieve the objectives of the conspiracy by concealing that fact.

Furthermore, LBS has failed to demonstrate that the admission of this evidence affected its "substantial rights." Fed.R. Crim.P. 52(a). It is highly probable that the admission of evidence that the Bank failed to file amended CTR's did not contribute to the jury's judgment of conviction. *See e.g., McQueeney v. Wilmington Trust Co.,* 779 F.2d 916 (3rd Cir.1985). This is so because there was other strong evidence of the Bank's guilt,[37] and because, contrary to the Bank's suggestion, the failure to amend was not stressed in the examination of witnesses or in the government's summation.[38] *See United States v. Zarintash,* 736 F.2d 66, 72 (3rd Cir.1984).

For the reasons stated above, the Motions of LBS Bank—New York, Inc., for Judgment of Acquittal and, in the alternative, for New Trial will be denied.

enter her home without a warrant was found to be constitutionally protected conduct. The Court reasoned,

> One cannot be penalized for passively asserting this right, regardless of one's motivation. Just as a criminal suspect may validly invoke his Fifth Amendment privilege in an effort to shield himself from criminal liability, so one may withhold consent to a warrantless search, even though one's purpose be to conceal evidence of wrongdoing.

*Prescott,* 581 F.2d at 1351 (citations omitted). Since LBS's refusal to file the amended CTR's was not constitutionally protected conduct, the ruling of the *Prescott* case is inapplicable.

36. *See supra* pp. 501–506.

37. *See supra* pp. 501–506.

38. (Trial Trans. 8/29/89 at 203–204); (Trial Trans. 8/31/89 at 159).